**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC**
S. MARY LIU (282884)
17 E. Main St., Suite 200
Pensacola, Florida 32502
Telephone: 850-202-1010
Facsimile: 850-916-7449
E-Mail: mliu@awkolaw.com

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (174156)
Kiley L. Grombacher, Esq. (245960)
Robert N. Fisher, Esq. (302919)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone: 805-270-7100
Facsimile: 805-270-7589
mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com
rfisher@bradleygrombacher.com

*Attorneys for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREG BLOOMFIELD, CRYSTAL MOORE, and RICHARD USLANDER, Individually and on Behalf of All Others Similarly Situated,<br><br>   Plaintiff,<br> v.<br><br>3M COMPANY;<br><br>  Defendant. | Case No.: **'23CV1818 BTM KSC**<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. NEGLIGENCE;<br>2. STRICT PRODUCT LIABILITY – MANUFACTURING DEFECT;<br>3. STRICT PRODUCT LIABILITY – FAILURE TO WARN;<br>4. VIOLATION OF |

CALIFORNIA'S UNFAIR COMPETITION LAW; and
5. VIOLATION OF MARYLAND'S CONSUMER PROTECTION ACT

**DEMAND FOR JURY TRIAL**

**CLASS ACTION COMPLAINT**

Plaintiffs Greg Bloomfield, Crystal Moore and Richard Uslander ("Plaintiffs"), individually and on behalf of all others similarly situated throughout the States of California and Maryland, files this Class Action Complaint against Defendant 3M Company ("Defendant"), and in support state the following:

**NATURE OF THE ACTION**

1. This is a class action lawsuit by Plaintiffs, and others similarly situated, who purchased Ultrathon™ Insect Repellent 8 (Spray) ("Ultrathon") products that are manufactured, marketed, sold and/or distributed by Defendant. Defendant's Ultrathon product has been independently tested and shown to be adulterated with excessive levels of benzene, a known human carcinogen. Excessive levels of benzene are present in *all* of Defendant's Ultrathon aerosol spray products; a fact that was not disclosed in the product's labeling, advertised, or otherwise, in violation of California and Maryland common law. Plaintiffs and the putative class suffered economic damages due to Defendant's misconduct (as set forth below) and they seek restitution for the full

purchase price of the Ultrathon product(s) they purchased. Plaintiffs allege the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiffs further believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and is a class action in which there are more than 100 class members and many members of the class are citizens of a state different than Defendant.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Plaintiff Greg Bloomfield suffered injury as a result of Defendant's acts in this district, many of the acts and transactions giving rise to this action occurred in this district, Defendant conducts substantial business in this district, Defendant has intentionally availed themselves of the laws and markets of this district, and Defendant is subject to personal jurisdiction in this district.

## THE PARTIES

4.      Plaintiff Greg Bloomfield resides in Escondido, California, and at all times relevant hereto has been a resident of the County of San Diego. Around the summer of 2022, Plaintiff Bloomfield purchased 3M's Ultrathon Insect Repellent from in San Diego

CLASS ACTION COMPLAINT

County. When purchasing the Ultrathon product, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the sunscreen products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the Ultrathon product, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that the Ultrathon product was adulterated with benzene, he would not have purchased the product. Plaintiff suffered economic injury when he spent money to purchase an Ultrathon product he would not otherwise have purchased absent Defendant's misconduct, as alleged herein.

5.    Plaintiff Crystal Moore resides in Sacramento, California, and at all times relevant hereto has been a resident of the County of Sacramento. Around 2022, Plaintiff Moore purchased 3M's Ultrathon Insect Repellent from Walmart, located at 6051 Florin Road in Sacramento, California. When purchasing the Ultrathon product, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the sunscreen products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the Ultrathon product, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that the Ultrathon product was adulterated with benzene, she would not have purchased the product. Plaintiff suffered economic injury

4
CLASS ACTION COMPLAINT

when she spent money to purchase an Ultrathon product she would not otherwise have purchased absent Defendant's misconduct, as alleged herein.

6.    Plaintiff Richard Uslander resides in Columbia, Maryland, in the County of Howard. In 2021 and 2022, Plaintiff Uslander purchased four bottles of 3M's Ultrathon Insect Repellent. He purchased two bottles from Walmart, located at 3200 North Ridge Road, Ellicott City, Maryland 21043 and two bottles from Target, located at 4390 Montgomery Road, Ellicott City, Maryland 21043. When purchasing the Ultrathon products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the sunscreen products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the Ultrathon products, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that the Ultrathon products were adulterated with benzene, he would not have purchased the products. Plaintiff suffered economic injury when he spent money to purchase Ultrathon products he would not otherwise have purchased absent Defendant's misconduct, as alleged herein.

7.    Plaintiffs and the putative class members seek monetary damages to address the harm caused by Defendant's actions, so there is a substantial likelihood that the relief sought will redress the injuries.

8.    Defendant 3M Company is a Delaware corporation having its principal place of business at 3M Center, 2501 Hudson Road, St. Paul, Minnesota 55144.

CLASS ACTION COMPLAINT

Defendant manufactures, distributes, markets and/or sells insect repellent products under the brand name 3M Ultrathon™ Insect Repellent 8 (Spray) to consumers nationwide, including California and Maryland. 3M may be served via its registered agent CSC – Lawyers Incorporating Service, 251 Little Falls Drive, Wilmington, Delaware 19808.

## FACTUAL ALLEGATIONS

9.       At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market sell, distribute the pesticide Ultrathon Insect Repellent.

10.       Initially approved by EPA in 1995, Ultrathon Insect Repellent aerosol spray is intended for human use as a broad-spectrum pesticide to repel mosquitoes, ticks, biting flies, chiggers, gnats, fleas, and deer flies.

11.     According to the Ultrathon label, DEET is the active ingredient making up 25% of the product. "Other ingredients" make up 75% of the product; these "other ingredients" are not identified on the label by name.

12.     Sprayed as an aerosol and applied directly onto the skin, Ultrathon uses a polymer to trap DEET and slowly release it over the skin surfaces to provide protection against insects.

### EVIDENCE OF CARCINOGENICITY IN ULTRATHON

13.     On or about March 2023, counsel for Plaintiffs acquired six bottles of 3M's Ultrathon Insect Repellent 8 aerosol products and submitted those six bottles for analysis by an independent, certified testing lab.  Every one of the six bottles of Ultrathon Insect

6

CLASS ACTION COMPLAINT

Repellent 8 products submitted for testing contained high levels of benzene, ranging from 11.633 ppm to 13.261 ppm.

14.    All of Defendant's Ultrathon Insect Repellent 8 aerosol spray products are manufactured in the same manner.

15.    Defendant systematically used benzene in the manufacture of *all* lots of 3M's Ultrathon Insect Repellent 8 spray products, including Plaintiffs' products.

16.    Defendant knew or should have known that Ultrathon was contaminated with excessive levels of benzene and that testing of the products for benzene was necessary to protect Plaintiffs and putative class members from harmful levels of benzene exposure.

17.    Defendant failed to appropriately and adequately test Ultrathon for the presence of benzene to protect Plaintiffs and the class from benzene exposure.

## EVIDENCE OF BENZENE'S DANGER

18.    Benzene is used primarily as a solvent in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The major United States source of benzene is petroleum. The health hazards of benzene have been recognized for over one hundred years.

CLASS ACTION COMPLAINT

19.     "Human exposure to benzene has been associated with a range of acute and long-term adverse health effects and diseases, including cancer and haematological effects."[1]

20.     A toxicity assessment by the Centers for Disease Control and Prevention has shown benzene can harm the central nervous system and may affect reproductive organs.[2]

21.     According to the World Health Organization, "Benzene is a genotoxic carcinogen in humans and no safe level of exposure can be recommended."[3]

22.     According to the National Cancer Institute, "[e]xposure to benzene increases the risk of developing leukemia and other blood disorders."[4]

23.     According to the National Toxicology Program ("NTP"), benzene is "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[5]

24.     Benzene has also been "found to be carcinogenic to humans" by the International Agency for Research on Cancer ("IARC"). Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[6] As noted by the IARC:

---

[1] https://www.who.int/publications/i/item/WHO-CED-PHE-EPE-19.4.2.
[2] https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf.
[3] WHO Guidelines for Indoor Air Quality: Selected Pollutants (2010).
[4] https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.
[5] http://ntp.niehs.nih.gov/go/roc/content/profiles/benzene.pdf (emphasis in original).
[6] Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans (2017: Lyon, France), at p. 33.

CLASS ACTION COMPLAINT

In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on *sufficient evidence* of carcinogenicity in humans, *sufficient evidence* of carcinogenicity in experimental animals, and *strong* mechanistic evidence. … The Working Group affirmed the strong evidence that benzene is genotoxic, and found that it also exhibits many other key characteristics of carcinogens, including in exposed humans. In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[7]

25.    The FDA also recognizes that "[b]enzene is a carcinogen that can cause cancer in humans"[8] and classifies benzene as a "Class 1" solvent that should be "avoided" in drug manufacturing.[9] FDA guidance provides: "Solvents in Class 1 [e.g. benzene] should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity." FDA, Q3C – 2017 Tables and List Guidance for Industry, https://www.fda.gov/media/71737/download.

26.    In July 2021, the FDA conducted a "Health Hazard Evaluation" on "Multiple Aerosol Sunscreen Products" manufactured by Johnson & Johnson.[10] The evaluation was requested following testing which showed benzene levels ranging "from 11.2 to 23.6 ppm" in Johnson & Johnson's aerosol sunscreen products. Specifically, the

---

[7] *Id*. at 34.
[8] https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinks-and-other-beverages#q1.
[9] https://www.fda.gov/media/71737/download.
[10] https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment.

CLASS ACTION COMPLAINT

agency requested "an evaluation of the likelihood and risks associated with using aerosol sunscreens that contain benzene 11.2 to 23.6 ppm," which "levels exceed the guideline value provided by ICH [Q3C][11] and USP[12]" limits, states the report. The FDA report concluded that serious adverse effects, including potential for "life-threatening" issues or "permanent impairment of a body function" were "likely to occur" at exposure levels within that range. In addition, the report stated that "individuals with altered skin absorption (i.e., infants, elderly, broken skin) and individuals who are exposed to benzene from other sources (e.g. smokers or occupational/environmental exposure) may be at greater risk."

27.     The EPA similarly recognizes the cancer risks of benzene, noting that "Benzene is classified as a 'known' human carcinogen (Category A) under the Risk Assessment Guidelines of 1986."[13] "[B]enzene is characterized as a known human carcinogen for all routes of exposure based on convincing human evidence as well as supporting evidence from animal studies."[14]

28.     EPA has set 0.0005 ppm as the maximum permissible level of benzene in drinking water, with a stated goal of "zero" ppm for benzene in drinking water.[15]

---

[11] The term "ICH" refers to The International Conference on Harmonization (ICH) Q3C Impurities: Residual Solvents guidance (December 1997), at https://www.fda.gov/media/71736/download?attachment.
[12] The term "USP" refers to United States Pharmacopeia (USP) Residual Solvents, at https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalChapter467Current.pdf.
[13] https://cfpub.epa.gov/ncea/iris2/chemicallanding.cfm?substance_nmbr=276.
[14] Id.
[15] https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations.

CLASS ACTION COMPLAINT

29.     According to the EPA's review of non-cancer adverse health effects of benzene, the agency has cited epidemiologic evidence that "support[s] a threshold of benzene hematotoxicity[16] in humans in the 5-19 ppm range[.]"[17]  As noted in the EPA's review, "[c]learly, if a significantly elevated risk of benzene poisoning is an indication of hematotoxicity, then certainly exposures to benzene at 5-19 ppm are hematotoxic."[18]

30.     "Even in trace amounts, benzene is known to pose a health risk from exposure routes that include inhalation, ingestion, dermal absorption, and skin or eye contact."[19]

31.     Direct benzene exposure through the skin is particularly concerning, because "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[20]  Accordingly, The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers exposed or expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes or paths.[21]

---

[16] The term "hematotoxic" means "poisonous to the blood and to the organs and tissues involved in the production of blood, such as the bone marrow." https://clinicalinfo.hiv.gov/en/glossary/hematotoxic.
[17] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0276tr.pdf.
[18] *Id.*
[19] Hudspeth, A., et al., Independent Sun Care Product Screening for Benzene Contamination, Environmental Health Perspectives, 130:3, Online Publication 29 March 2022.
[20] *Facts About Benzene,* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last visited September 6, 2022).
[21] *NIOSH Pocket Guide to Chemical Hazards - Benzene*, THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (NIOSH), https://www.cdc.gov/niosh/npg/npgd0049.html (last visited September 6, 2022).

CLASS ACTION COMPLAINT

32.     As with other topically applied products, such as sunscreen, the application of insect repellent specifically increases the absorption rate of benzene through the skin, thereby increasing the risk of harm.[22]

**REGISTRATION OF PESTICIDES UNDER FEDERAL AND STATE LAW**

33.     The manufacture, formulation and distribution of pesticides, such as Ultrathon, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

34.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

35.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic,

---

[22] *Valisure Detects Benzene in Sunscreen*, VALISURE BLOG (May 25, 2021), https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/.

CLASS ACTION COMPLAINT

social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

36.     The EPA, and the States of California and Maryland, have registered Ultrathon Insect Repellent 8 aerosol for distribution, sale, and manufacture: EPA registration number 58007-7; California registration number 58007-7-ZA; Maryland registration number 3M (RNO 600) [58007-7].

37.     Defendant's Ultrathon is regulated by the U.S. EPA under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA).[23]

38.     In California, Ultrathon is regulated by the California Department of Pesticide Regulation under Food and Agricultural Code section 14005, and Cal. Code of Regs., title 3, section 6242.

39.     In Maryland, Ultrathon is regulated by the Maryland Department of Agriculture under the Maryland Pesticide Registration and Labeling Law, Md. Code, Agric. § 5-101-114.

40.     FIFRA generally requires that the registrant—3M Company in the case of Ultrathon—conduct health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is

---

[23] Title 40 Code of Federal Regulations, Part 156.

CLASS ACTION COMPLAINT

not required, nor is it able, to perform the product tests that are required of the manufacturer.

41.    FIFRA provides that a pesticide is misbranded:

> (1) if its labeling "does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with ... are adequate to protect health" (7 U.S.C. § 136(q)(1)(F));
> (2) if its label "does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment" (7 U.S.C. § 136(q)(1)(G)); or
> (3) if "the pesticide contains any substance or substances in quantities highly toxic to man, unless the label shall bear, in addition to any other manner required by this subchapter – (i) the skull and crossbones; (ii) the word 'poison' prominently in red on the background of distinctly contrasting color; and (iii) a statement of a practical treatment (first aid or otherwise) in case of poisoning by the pesticide." (7 U.S.C. § 136(q)(2)(D)).

42.    A pesticide product is further misbranded under FIFRA if its label contains a statement that is "false or misleading in any particular." (7 U.S.C. § 136(q)(1)(A)).

43.    Under FIFRA, the registration and approval of a label is not a defense to a claim of misbranding. (7 U.S.C. § 136a(f)(2)).

44.    Similarly, in strict liability, California law requires that manufacturers must adequately warn of particular risks that were known or knowable in light of generally recognized and prevailing best science and medical knowledge at the time of the manufacture and distribution.

CLASS ACTION COMPLAINT

45.    In negligence, California law requires a manufacturer to warn of those risks that a reasonably prudent manufacturer would have known and warned about.

46.    California law similarly requires that "[i]t is unlawful for any person to sell any adulterated or misbranded pesticide.". Cal. Food & Agric. Code § 12992.

47.    A pesticide is misbranded under California law if "(a) the packaging or label bears any false or misleading statement . . . regarding the article or any ingredient or substance that is contained in it" or "[i]t is labeled . . . so as to deceive or mislead the purchaser." Cal. Food & Agric. Code § 12881.

48.    California law requires that a pesticide must contain "[w]arning or caution statements, which are necessary, and if complied with, adequate to prevent injury to living man . . . [and] must appear on the label in a place sufficiently prominent to warn the user, and must state clearly and in nontechinical language the particular hazard involved in the use of the pesticide[.]" Cal. Code of Regs., title 3, section 6242.

49.    California law requires that "the label of every pesticide shall bear warnings or cautions which are necessary for the protection of the public[.]" Cal. Code of Regs., title 3, section 6242(a).

50.    Additionally, "the label of every pesticide which is highly toxic to man shall bear the word 'Danger' along with the word 'Poison' in red on contrasting background in immediate proximity to the skull and crossbones[.]" Cal. Code of Regs., title 3, section 6242(b).

CLASS ACTION COMPLAINT

51.    The scope of California's labeling requirements for pesticides specifically provides that "[t]he labeling requirements under California law meet, but do not exceed current U.S. EPA labeling requirements."  Cal. Code of Regs., title 3, section 6243.

52.    The levels of benzene detected in Defendant's Ultrathon product are highly toxic to man. Defendant wrongfully advertised and sold its Ultrathon Insect Repellent without any labeling to indicate to consumers that the product was adulterated with excessive levels of benzene, in violation of California law.

53.    In strict liability, Maryland law requires that manufacturers must adequately warn of particular risks that were known or knowable in light of generally recognized and prevailing best science and medical knowledge at the time of the manufacture and distribution.

54.    In negligence, Maryland law requires a manufacturer to warn of those risks that a reasonably prudent manufacturer would have known and warned about.

55.    The Maryland Pesticide Registration and Labeling Law provides that it is unlawful under Maryland law for a person to distribute, sell, or offer for sale "any adulterated or misbranded pesticide." Md. Code, Agric. § 5-109(a)(2).

56.    A pesticide is misbranded under Maryland law if its labeling "does not contain a warning or caution statement which may be necessary and adequate if complied with, to prevent injury to living man . . . ." Md. Code, Agric. § 5-109(q)(5).

CLASS ACTION COMPLAINT

57.     Under Maryland law, a product is also misbranded, "when used as directed or in accordance with commonly recognized practice, the pesticide is injurious to living man including any person applying it . . . ." Md. Code, Agric. § 5-109(q)(8).

58.      Ultrathon is misbranded under Maryland law because the labeling does not include a warning or caution statement related to the presence of benzene that is necessary to prevent injury to living man.

59.     The following image shows an example of the Ultrathon Insect Repellent product purchased by Plaintiffs and the putative class members:

 

CLASS ACTION COMPLAINT

60.    Accordingly, Defendant did not comply with California or Maryland law with respect to its designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Ultrathon.

## **CLASS ALLEGATIONS**

61.    Plaintiffs bring this action on behalf of themselves and all others similarly situated class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following class against Defendants for violations of California state laws (the "Class"):

> All consumers who purchased 3M Ultrathon Insect Repellent aerosol spray in the United States and its territories from October 2, 2019 to the present for personal use or consumption.

> Excluded from the Class are individuals who allege personal bodily injury resulting from the use of 3M Ultrathon Insect Repellent(s). Also excluded from this Class is Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

62.    In the alternative, Plaintiffs bring this action on behalf of themselves and all other similarly situated California consumers pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following class:

> **California Sub-Class**

> All consumers who purchased 3M Ultrathon Insect Repellent aerosol spray in the State of California from October 2, 2019 to the present for personal use or consumption.

CLASS ACTION COMPLAINT

Excluded from the Class are individuals who allege personal bodily injury resulting from the use of 3M Ultrathon Insect Repellent(s). Also excluded from this Class is Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

### Maryland Sub-Class

All consumers who purchased 3M Ultrathon Insect Repellent aerosol spray in the State of Maryland from October 2, 2019 to the present for personal use or consumption.

Excluded from the Class are individuals who allege personal bodily injury resulting from the use of 3M Ultrathon Insect Repellent(s). Also excluded from this Class is Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

63.     The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiffs are informed and believe that the proposed Class contains thousands of purchasers of Ultrathon who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiffs at this time.

64.     Plaintiffs' claims are typical to those of all Class members because members of the class are similarly injured through Defendant's uniform misconduct described above and were subject to Defendant's misleading claims that accompanied each and

CLASS ACTION COMPLAINT

every Ultrathon Insect Repellent aerosol product. Plaintiffs are advancing the same claims and legal theories on behalf of herself and all members of the Class.

67.    Plaintiffs' claims raise questions of law and fact common to all members of the Class, and they predominate over any questions affecting only individual Class members. The claims of Plaintiffs and all prospective Class members involve the same alleged defect. These common legal and factual questions include the following:

> (a)    whether Defendant's Ultrathon Insect Repellent aerosol spray contains benzene;
> (b)    whether Defendant's omissions are true, or are misleading, or objectively reasonably likely to deceive or mislead;
> (c)    whether the alleged conduct constitutes violations of the laws asserted;
> (d)    whether Defendant's alleged conduct violates public policy;
> (e)    whether Defendant's engaged in false or misleading advertising; and
> (f)    whether Plaintiffs and the Class members are entitled to damages and/or restitution and the proper measure of that loss.

68.    Plaintiffs and their counsel will fairly and adequately protect and represent the interests of each member of the class. Plaintiffs have retained counsel experienced in complex litigation and class actions. Plaintiffs' counsel has successfully litigated other class action cases similar to that here and have the resources and abilities to fully litigate and protect the interests of the class. Plaintiffs intend to prosecute this claim vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class, nor are Plaintiffs subject to any unique defenses.

CLASS ACTION COMPLAINT

69.     A class action is superior to the other available methods for a fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by the Plaintiffs and individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiffs and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Further, it is desirable to concentrate the litigation of the Class members' claims in one forum, as it will conserve party and judicial resources and facilitate the consistency of adjudications. Plaintiffs know of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action.

## FIRST CAUSE OF ACTION

(Negligence)

70.     Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

71.     Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Ultrathon into the stream of commerce, including a duty to assure that the product would not cause users to be unreasonably and unnecessarily exposed to excessive levels of toxic substances like benzene.

72.     Defendant failed to exercise ordinary care in the designing, researching,

CLASS ACTION COMPLAINT

testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Ultrathon into interstate commerce in that Defendant knew or should have known that Ultrathon was adulterated with dangerous levels of the carcinogen benzene, thus unreasonably and unnecessarily exposing users to a toxic substance.

73.    The negligence by the Defendant, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

(a) Manufacturing, producing, promoting, formulating, creating, and/or designing Ultrathon without thoroughly testing it before distribution;

(b) Failing to test Ultrathon and/or failing to adequately, sufficiently, and properly test Ultrathon;

(c) Not conducting sufficient testing programs to determine whether or not Ultrathon was safe for use; in that Defendant knew or should have known that Ultrathon was contaminated and/or adulterated with benzene which rendered the product unsafe and unfit for use by reason of the dangers to its users;

(d) Not conducting sufficient testing programs and studies to determine Ultrathon's carcinogenic properties even after Defendant had knowledge that Ultrathon is, was, or could be carcinogenic;

(e) Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Ultrathon, and the propensity of these ingredients to render Ultrathon toxic or increase the toxicity of Ultrathon;

(f) Negligently failing to adequately and correctly warn the Plaintiff, the public, and the EPA of the dangers of Ultrathon;

(g) Negligently failing to petition the EPA to strengthen the warnings associated with Ultrathon;

(h) Failing to provide adequate cautions and warnings to protect the health of users who would reasonably and foreseeably come into contact with Ultrathon;

(i) Negligently marketing, advertising, and recommending the use of Ultrathon without sufficient knowledge as to its dangerous

CLASS ACTION COMPLAINT

propensities;

(j) Negligently representing that Ultrathon was safe for use for its intended purpose when, in fact, it was unsafe;

(k) Negligently representing that Ultrathon had equivalent safety and efficacy as other forms of insect repellent products;

(l) Negligently designing Ultrathon in a manner which was dangerous to its users;

(m) Negligently manufacturing Ultrathon in a manner which was dangerous to its users;

(n) Negligently producing Ultrathon in a manner which was dangerous to its users;

(o) Negligently formulating Ultrathon in a manner which was dangerous to its users;

(p) Concealing information from the Plaintiffs and the public when Defendant knew, or should have known, that Ultrathon was unsafe, dangerous, and/or non-conforming with EPA and California or Maryland state regulations;

(q) Improperly concealing and/or misrepresenting information from the Plaintiffs, scientific and medical professionals, and/or the EPA, concerning the risks and dangers of Ultrathon compared to other forms of insect repellents; and

(r) Negligently selling Ultrathon with a false and misleading label.

74.    Defendant was negligent and/or violated California and Maryland law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Ultrathon in that it:

(a) Failed to use ordinary care in designing and manufacturing Ultrathon so as to avoid the aforementioned risks to individuals when Ultrathon was used as a pesticide;

(b) Failed to accompany its product with proper and/or accurate warnings regarding the presence of benzene and the possible adverse side effects associated with such exposure;

(c) Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the presence of benzene and/or safety of Ultrathon;

(d) Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Ultrathon's

CLASS ACTION COMPLAINT

"inert" ingredients and/or adjuvants;

(e) Negligently misrepresented the evidence of Ultrathon's carcinogenicity; and

(f) Was otherwise careless and/or negligent.

75.    Despite the fact that Defendant knew or should have known that Ultrathon was adulterated with harmful levels of benzene which could cause unreasonably dangerous side effects, Defendant continued, and continues, to market, manufacture, distribute, and/or sell benzene-contaminated Ultrathon to consumers.

76.    Defendant knew or should have known that consumers such as Plaintiffs would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

77.    Defendant's violations of law and/or negligence were the proximate cause of Plaintiffs' economic loss.

78.    As a result of the foregoing acts and omissions, the Plaintiffs suffered financial loss.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## **SECOND CAUSE OF ACTION**

### (Strict Liability – Design Defect)

CLASS ACTION COMPLAINT

79.    Plaintiffs incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

80.    Plaintiffs bring this strict liability claim against Defendant for defective design.

81.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Ultrathon products, which is defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Ultrathon into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed its Ultrathon product used by the Plaintiffs, as described above.

82.    At all times relevant to this litigation, Defendant's Ultrathon product was manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

83.    At all times relevant to this litigation, Defendant's Ultrathon product reached the intended consumers and users in California and Maryland and throughout the United

CLASS ACTION COMPLAINT

States, including Plaintiffs, without substantial change in its condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

84. Defendant's Ultrathon product, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when it left the hands of the Defendant's manufacturers and/or suppliers, it was unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

85. Defendant's Ultrathon product, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant was defective in design and formulation in that when it left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with its design and formulation.

86. At all times relevant to this action, Defendant knew or had reason to know that its Ultrathon product was defective and was inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

87. Therefore, at all times relevant to this litigation, Defendant's Ultrathon product, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant was defective in design and formulation, in one or more of the following ways:

(a) When placed in the stream of commerce, Defendant's Ultrathon product was defective in design and formulation, and,

26
CLASS ACTION COMPLAINT

consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

(b) When placed in the stream of commerce, Defendant's Ultrathon product was unreasonably dangerous in that it was hazardous and posed a risk of leukemia and other serious illnesses when used in a reasonably anticipated manner;

(c) When placed in the stream of commerce, Defendant's Ultrathon product contained unreasonably dangerous design defects and was not reasonably safe when used in a reasonably anticipated or intended manner;

(d) Defendant did not sufficiently test, investigate, or study its Ultrathon product for the presence of dangerous levels of benzene;

(e) Exposure to Ultrathon and high levels of benzene presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the pesticide;

(f) Defendant knew or should have known at the time of marketing its Ultrathon product that exposure to Ultrathon and

CLASS ACTION COMPLAINT

specifically, high levels of benzene, could result in leukemia and other severe illnesses and injuries;

(g) Defendant did not conduct adequate post-marketing surveillance of its Ultrathon product; and

(h) Defendant could have employed safer alternative designs and formulations.

88.    Plaintiffs were exposed to Defendant's Ultrathon product without knowledge of its dangerous characteristics.

89.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Ultrathon product in an intended or reasonably foreseeable manner without knowledge of its dangerous characteristics.

90.    Plaintiffs could not have reasonably discovered the defects and risks associated with Ultrathon before or at the time of exposure.

91.    The potential harm caused by Defendant's Ultrathon product far outweighed its benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Ultrathon product was and is more dangerous than alternative products and Defendant could have designed its Ultrathon product to make it less dangerous. Indeed, as Valisure's testing confirmed, not all of the insect repellent aerosols tested contained benzene. As a result, at the time that Defendant designed its Ultrathon product, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

92.    At the time the Ultrathon product left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the

CLASS ACTION COMPLAINT

economic harm without substantially impairing the reasonably anticipated or intended function of Defendant's Ultrathon product.

93.    Therefore, as a result of the unreasonably dangerous condition of its Ultrathon product, Defendant is strictly liable to Plaintiffs and the putative Class.

94.    The defects in Defendant's Ultrathon product were substantial and contributing factors in causing Plaintiffs' economic injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have purchased Defendant's Ultrathon product.

95.    As a direct and proximate result of Defendant placing its defective Ultrathon product into the stream of commerce, Plaintiffs have suffered economic loss.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## THIRD CAUSE OF ACTION

(Strict Product Liability - Failure to Warn)

96.    Plaintiffs incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

97.    Defendant engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Ultrathon, and through that conduct have knowingly and intentionally placed Ultrathon into the stream of commerce with full

CLASS ACTION COMPLAINT

knowledge that it reaches consumers such as Plaintiffs who are exposed to it through ordinary and reasonably foreseeable uses.

98.    Defendant did in fact sell, distribute, supply, manufacture, and/or promote Ultrathon to Plaintiffs. Additionally, Defendant expected the Ultrathon that it was selling, distributing, supplying, manufacturing, and/or promoting to reach - and Ultrathon did in fact reach - consumers, including Plaintiffs, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

99.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of using benzene-contaminated Ultrathon products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such a carcinogen.

100.   At all times herein mentioned, the Ultrathon was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Plaintiffs were exposed to the product. The defective condition of Ultrathon was due in part to the fact that it was not accompanied by proper warnings regarding the presence of benzene and its carcinogenic qualities and possible side effects, including developing leukemia and other bloodborn diseases as a result of exposure and use.

101.   Ultrathon did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

CLASS ACTION COMPLAINT

102.    Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the States of California and Maryland.

103.    Defendant could have amended the label of Ultrathon to provide additional warnings.

104.    This defect caused economic injury to Plaintiffs, who purchased and used Ultrathon in its intended and foreseeable manner.

105.    At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, provide proper warnings, and take such steps to assure that the product did not cause users to be unnecessarily exposed to dangerous chemicals like benzene.

106.    Defendant labeled, distributed, and promoted Ultrathon even though it was dangerous and unsafe for the use and purpose for which it was intended.

107.     Defendant failed to warn of the presence of benzene in its Ultrathon product or of the nature and scope of the side effects associated with exposure to benzene— namely, its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of leukemia and other blood disorders.

108.    Despite the fact that Defendant knew or should have known that Ultrathon was adulterated and/or contaminated with dangerous levels of benzene, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side

CLASS ACTION COMPLAINT

effects of benzene in its Ultrathon product, even though these side effects were known or reasonably scientifically knowable at the time of distribution.

109.    At the time of exposure, Plaintiffs could not have reasonably discovered any defect in Ultrathon through the exercise of reasonable care.

110.    Defendant, as the manufacturers and/or distributors of Ultrathon, are held to the level of knowledge of an expert in the field.

111.    Plaintiffs reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

112.    Had Defendant properly disclosed the presence of benzene in Ultrathon and the risks associated with benzene exposure, Plaintiffs would not have purchased Ultrathon.

113.    As a result of their inadequate warnings, Defendant's Ultrathon product was defective and unreasonably dangerous when it left the possession and/or control of Defendant and used by Plaintiffs.

114.    As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the Ultrathon product caused Plaintiffs to sustain economic injuries as herein alleged.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

CLASS ACTION COMPLAINT

## **FOURTH CAUSE OF ACTION**

(Violations of California's Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code § 17200, *Et Seq.*)

(On behalf of Plaintiffs Bloomfield and Moore and the California Sub-Class)

115.  Plaintiffs Bloomfield and Moore incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

116.  The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising…." Cal. Bus. & Prof. Code § 17200.

*Fraudulent Acts and Practices*

117.  Any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice under the UCL. Similarly, any advertising that is deceptive, untrue or misleading constitutes a fraudulent business act or practice under the UCL.

118.  Defendant has engaged, and continues to engage, in conduct that is likely to deceive members of the public. This conduct includes failing to disclose in its Ultrathon Insect Repellent that the product contains excessive levels of benzene, a known human carcinogen.

119.  Similarly, Defendant has engaged, and continues to engage, in deceptive, untrue, and misleading advertising by representing that its Ultrathon Insect Repellent are

CLASS ACTION COMPLAINT

safe when, in fact, the product is not safe because it contains excessive levels of benzene which is harmful to human health when used as directed.

120.  By committing the acts alleged above, Defendants have engaged in fraudulent business acts and practices, which constitute unfair competition within the meaning of Business & Professions Code §17200.

*Unlawful Acts and Practices*

121.        The violation of any law constitutes an unlawful business practice under Business & Professions Code §17200.[24]

122.        Defendant's conduct also violates Cal. Health & Safety Code § 111730, which prohibits the sale of any misbranded product. The Ultrathon Insect Repellent label is "false and misleading in any particular" because it fails to disclose to consumers, including Plaintiffs, that the product contains excessive levels of benzene, in violation of Health & Safety Code § 111730.

123.        By violating the FTC Act and/or Cal. Health and Safety Code § 111730, Defendant have engaged in unlawful business acts and practices which constitute unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200.

*Unfair Acts and Practices*

---

[24] Defendant's conduct also violates Section 5 of the Federal Trade Commission "("FTC") Act, 15 U.S.C. § 45, which prohibits unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce.

CLASS ACTION COMPLAINT

124.    Any business practice that offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers constitutes an "unfair" practice under the UCL.

125.    Defendant has engaged, and continues to engage, in unfair business practices. This conduct includes representing that its Ultrathon Insect Repellent is safe when, in fact, it is not safe because it contains excessive levels of benzene.

126.    Defendant has engaged, and continues to engage, in conduct that violates the legislatively declared policies of the FTC Act against committing unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce. Defendant gained an unfair advantage over its competitors, whose advertising for products must comply with the FTC Act.

127.    Defendant's conduct, including misrepresenting the safety and efficacy of its Ultrathon Insect Repellent, is substantially injurious to consumers. Consumers are purchasing and, as instructed in the label, applying the product to their skin without knowledge that the product contains excessive levels of benzene, which can be absorbed into the body through the skin. Moreover, consumers, including Plaintiffs Bloomfield and Moore, would not have paid for insect repellent adulterated with excessive levels of benzene but for Defendant's false labeling, advertising, and promotion. Thus, Plaintiffs Bloomfield and Moore and the putative Class have "lost money or property" as required for UCL standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

CLASS ACTION COMPLAINT

128.   Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers, including Plaintiffs Bloomfield and Moore, reasonably rely on Defendant's representation that its product is safe when used as directed, consumers could not have reasonably avoided such injury. Nor could consumers, including Plaintiffs Bloomfield and Moore, prior to purchase, have reasonably undertaken testing of the product to determine that it contained excessive levels of benzene.

129.   By committing the acts described above, Defendant has engaged in unfair business acts and practices which constitute unfair competition within the meaning of the UCL.

WHEREFORE, Plaintiffs Bloomfield and Moore and California Sub-Class seek an order for the restitution of all monies spent on Defendant's Ultrathon Insect Repellents, which were acquired through acts of fraudulent, unfair, or unlawful competition.[25] In addition, because the Ultrathon Insect Repellent contain excessive levels of benzene, a known human carcinogen, the measure of restitution should be rescission and full refund insofar as the insect repellent is worthless. But for Defendant's misrepresentations and omissions, Plaintiffs Bloomfield and Moore and the California Sub-Class would have paid nothing for insect repellent that is contaminated with excessive levels of a human

---

[25] "Actions for relief pursuant to this chapter shall be prosecuted . . . by a person who has suffered injury in fact and lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204.

"The court may make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203.

CLASS ACTION COMPLAINT

carcinogen. Indeed, there is no discernible "market" for an over-the-counter insect repellent that is adulterated with excessive levels of a known human carcinogen. As recognized by the World Health Organization, "[b]enzene is carcinogenic to humans, and no safe level of benzene can be recommended."[26] Indeed, the levels of benzene detected in Ultrathon Insect Repellent exceed FDA, EPA and NIOSH guidelines for such contaminants. As a result, the levels of benzene detected in Ultrathon Insect Repellent products renders the products valueless.

## **FIFTH CAUSE OF ACTION**

(Violation of Maryland's Consumer Protection Act, Md. Code Ann. Com. § 13-101, *et seq*.)

(On behalf of Plaintiff Uslander and the Maryland Sub-Class)

68.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

69.    Plaintiff Uslander brings this Count individually and on behalf of the Maryland Sub-Class.

70.    Plaintiff is a "consumer" within the meaning of the Maryland Consumer Protection Act ("MCPA") in that he is an actual purchaser of consumer goods (i.e. Ultrathon). Md. Code Ann. Com. § 13-101 (c)(1).

71.    Defendant is engaged in the practice of manufacturing, marketing,

---

[26] https://www.who.int/ipcs/features/benzene.pdf.

CLASS ACTION COMPLAINT

distributing, selling and otherwise placing into the stream of commerce Ultrathon Insect Repellent, which constitutes a "merchant" under the MCPA. Md. Code Ann. Com. § 13-101 (2)(g).

72.    Maryland's CPA was adopted to, among other things, "take strong and preventative steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland." Md. Code Ann. Com. § 13-102(b)(3).

73.    The MCPA defines "unfair, abusive, or deceptive trade practices" to include any false or misleading written statement or representation of any kind which has the capacity, tendency or effect of deceiving or misleading consumers. Md. Code Ann. Com. § 13-301. This includes any representation that (1) consumer goods have a characteristic, use, or benefit which they do not have; and (2) consumer goods are of a particular standard or quality which they are not. Md. Code Ann. Com. § 13-301(1); (2)(i).

74.    It is unlawful under the MCPA for a merchant to fail to state a material fact if the failure deceives or tends to deceive the consumer. Md. Code Ann. Com. § 13-301(3).

75.    It is unlawful under the MCPA for a merchant to make a false or misleading representation of fact which concerns "deception, fraud, false pretenses, misrepresentation or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . the sale of any consumer goods." Md. Code Ann. Com. § 13-301(7).

CLASS ACTION COMPLAINT

76.     Any practice prohibited by the MCPA is a violation, "whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." Md. Code Ann. Com. § 13-302.

77.     Maryland's CPA provides for a private right of action for any consumer who is subject to unfair, abusive, or deceptive trade practices. Md. Code Ann. Com. §§ 13-401(e)(1) & (2); 13-408.

78.     Finally, Maryland's CPA "shall be construed and applied liberally to promote its purpose." Md. Code Ann. Com. § 13-105.

79.     Defendant has violated the Maryland CPA by selling Ultrathon to Maryland consumers without disclosing that the product was contaminated with benzene, which is a material fact that consumers had a right to know before purchasing the product. It is deceptive and misleading for Defendant to misrepresent or knowingly conceal, suppress, or omit this material fact with the intent that consumers rely on the same in connection with the purchase of the product. Defendant's omission or knowing concealment of the fact that its Ultrathon product contains benzene has the capacity, tendency or effect of deceiving and misleading consumers, and in fact did deceive and mislead Plaintiff Uslander.

80.     Additionally, because Ultrathon was contaminated with benzene, the product did not have the characteristic or benefit represented by Defendant, nor was the product of the particular standard or quality represented. Indeed, there is no conceivable benefit to consumers who purchase an over-the-counter insect repellent that unknowingly exposes

them to dangerous levels of a human carcinogen unlawfully contained in the product.

81.    By committing the acts alleged above, Defendant has engaged in unfair, abusive, or deceptive trade practices in violation of the MCPA.

82.    As a result of Defendant's unfair, abusive, and deceptive trade practices, Plaintiff Uslander and the Maryland Sub-Class members are entitled to an award of attorney's fees pursuant to Section 13-408 of the MCPA, if they prevail.

WHEREFORE, Plaintiff Uslander and members of the Maryland Sub-Class are entitled to a full refund in the amount they spent on the Defendant's Ultrathon Insect Repellent product(s) and attorneys' fees.

## LIMITATION OF ALLEGATIONS

83.    The allegations in this pleading are made pursuant to California and Maryland law. To the extent California or Maryland law impose a duty or obligation on the Defendant that exceeds those required by federal law, Plaintiffs do not assert such claims. All claims asserted herein run parallel to federal law, i.e., the Defendant's violations of California and Maryland law were also violations of federal law. Had Defendant complied with California and Maryland law, it would also have complied with federal law.

84.    Additionally, Plaintiffs' claims do not seek to enforce federal law. These claims are brought under California and Maryland law, notwithstanding the fact that such claims run parallel to federal law.

85.    As alleged in this pleading, the Defendant violated 7 U.S.C. § 136(q) and 40

C.F.R. § 156.10(a)(1)(vii) by distributing Ultrathon without the requisite hazard and

precautionary statements, which renders the product misbranded pursuant to 7 U.S.C. §

136(g). Federal law specifically prohibits the distribution of a misbranded pesticide.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly

situated, pray for judgment against the Defendant as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing
Plaintiffs and their counsel to represent the Class, and requiring Defendant
to bear the costs of class notice;

B.    An order requiring Defendant to pay restitution to restore all funds acquired
by means of any act or practice declared by this Court to be an unlawful,
unfair, or fraudulent business act or practice, untrue or misleading
advertising, or a violation of California and/or Maryland law, plus pre- and
post-judgment interest thereon;

C.    An order requiring Defendant to pay all actual and statutory damages
permitted under the counts alleged herein;

D.    An order awarding attorneys' fees and costs to Plaintiffs and the putative
Class; and

E.    An order providing for all other such equitable relief as may be just and
proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

*[Signatures to Follow on Next Page]*

//

//

CLASS ACTION COMPLAINT

DATED: October 2, 2023

By:  /s/S. Mary Liu
**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC**
S. MARY LIU (282884)
17 E. Main St., Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Facsimile: 850-916-7449
E-mail: mliu@awkolaw.com
         cduer@awkolaw.com

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (174156)
Kiley L. Grombacher, Esq. (245960)
Robert N. Fisher, Esq. (302919)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone: 805-270-7100
Facsimile: 805-270-7589
mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com
rfisher@bradleygrombacher.com

CLASS ACTION COMPLAINT